# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>GULFCO HOLDING CO.,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 13-13113 (BLS) |
| GULFCO HOLDING CORP.,<br><br>Plaintiff,<br><br>vs.<br><br>PROSPECT CAPITAL CORP.,<br><br>Defendant. | Adv. No. 13-__________ |

## COMPLAINT

Plaintiff, Gulfco Holding Corp. (the "**Debtor**" or the "**Plaintiff**") by and through its undersigned counsel, Benesch, Friedlander, Coplan & Aronoff LLP, hereby brings this action against Prospect Capital Corporation ("**Defendant**" or "**Prospect**"), and alleges as follows:

## PRELIMINARY STATEMENT

1. The Plaintiff's investigation into Defendant's unlawful conduct with respect to the Debtor remains ongoing. Since the Debtor commenced this bankruptcy case, however, the Debtor has learned that its bankruptcy and loss of its primary asset — for which the Debtor paid $72 million in October 2012 — resulted from Defendant's scheme to steal that asset: Debtor's wholly owned subsidiary Gulf Coast Machine and Supply Company. ("**Gulf Coast**").

[1] The Debtor's business address is 10 Westport Road, Suite C204, Wilton, CT 06897. The last four digits of the Debtor's tax identification number are 2900.

2. In 2012, Defendant tried and failed to acquire Gulf Coast. After Defendant lost its bid to acquire Gulf Coast, it offered to finance part of the Debtor's acquisition of Gulf Coast. Prospect, however, concealed from the Debtor its desire and its own previous failed attempts to acquire Gulf Coast. Unaware of Prospect's desires and previous endeavor, the Debtor borrowed $42 million from Prospect to partially finance the Debtor's $72 million acquisition of Gulf Coast in October 2012.

3. In the thirteen months that followed the Debtor's acquisition of Gulf Coast, Prospect implemented a scheme to systematically pressure Gulf Coast in an effort to realize its true goal: to own Gulf Coast. For example, in May 2013, Prospect seized upon the effects of an industry downturn by asserting a financial covenant default under its loan agreement and then charged and collected significant default interest while Gulf Coast's other lender did not.

4. While Prospect pressured Gulf Coast and the Debtor by charging and collecting default interest, Prospect refused to discuss in good faith the financial covenant default that Prospect asserted. Gulf Coast and the Debtor, on numerous occasions, made several good faith proposals to resolve Prospect's asserted defaults. Prospect, however, responded to such proposals with unrealistic counter-demands or did not respond at all.

5. Rather, Prospect moved forward with its goal of transferring ownership and control of the Debtor's property to itself. In September 2013, Prospect's misconduct caused the Debtor's and Gulf Coast's other lender to install a $1 million block on Gulf Coast's line of credit. Prior to September 2013, the Gulf Coast did not have any liquidity issues. After Prospect caused the $1 million block, Gulf Coast began having liquidity problems. Prospect took advantage of the situation it had helped create and pushed Debtor and Gulf Coast even harder for concessions.

6. In the next month, while the Debtor and Gulf Coast believed they were involved in good faith discussions with Prospect, and during a time when Gulf Coast's business showed signs of improvement, Prospect consummated its clandestine plan to take Gulf Coast from the Debtor.

7. In a surprise move on November 8, 2013, with the only asserted default being a financial covenant – as opposed to a non-payment – violation, Prospect purported to exercise its rights under the Debtor's pledge of its stock in Gulf Coast to oust Gulf Coast's entire board of directors, install three Prospect personnel as directors, and transfer 99.9% of the ownership and control of Gulf Coast to itself. This left Debtor with a mere 0.1% ownership interest, and no control, in Gulf Coast.

8. Although during the bankruptcy case the Debtor has attempted to learn additional facts surrounding Prospect's prepetition misconduct, Prospect has stonewalled those efforts and continues its attempts to conceal its misconduct.

9. Plaintiff now brings this action to recover, among other things, the involuntary, preferential, and fraudulent transfers that Prospect engineered, in the Debtor's name and on the Debtor's behalf, without the Debtor's consent, and while Prospect was serving as a fiduciary to the Debtor.

10. Because the Debtor's investigation is ongoing, including through the several examinations it seeks to take under Fed. R. Bankr. P. 2004, the Debtor likely will file an amended complaint against Prospect when its investigation concludes.

**JURISDICTION AND VENUE**

11. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1331 and 1334(b) and 28 U.S.C. § 157(a), which is a civil proceeding arising under, arising in, and/or related to a case under title 11 of the United States Code (the "Bankruptcy Code").

12. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O).

13. Plaintiff consents to the Bankruptcy Court's entry of a final adjudication of the merits of this Complaint in accordance with Rule 7008 of the Federal Rules of Bankruptcy Procedure.

14. Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

15. The statutory predicates for the relief sought herein are 11 U.S.C. §§ 547, 548, and 550 and the law of the State of New York.

**PARTIES**

16. The Debtor is a Delaware corporation with its principal place of business located at 10 Westport Road, Suite C204, Wilton, Connecticut 06897.

17. Defendant is a Maryland corporation with its principal place of business at 10 East 40th Street, 44th Floor, New York, NY 10016.

**FACTUAL BACKGROUND**

18. Founded in 1919 and headquartered in Beaumont, Texas, Gulf Coast is a leading provider of forged products to energy and industrial customers in the oil and gas, mining, construction, and heat exchange industries.

19. In 2012, Altus Capital Partners II, L.P. ("**Altus**"), the Debtor's largest shareholder, became the successful bidder in a blind auction for the purchase of Gulf Coast As a result, Altus incorporated the Debtor under Delaware law to acquire all of the shares of Gulf Coast's stock.

20. Unbeknownst to the Debtor and Altus (because the auction was a blind auction), Prospect, either by itself or through one of its affiliates or entities under its control, Prospect

Case 13-11003-BLS Doc 1 Filed 01/31/14 Page 5 of 18

Capital Management ("**Prospect Capital Management**"), and/or Ajax Forge Company ("**Ajax**"), also desired to acquire Gulf Coast and attempted to do so in the auction process.

21. On October 12, 2012 (the "**Closing Date**"), the Debtor closed on the successful auction bid through a transaction in which it acquired all of the outstanding stock in Gulf Coast.

22. As a result, the Debtor became the one hundred percent (100%) shareholder and owner of Gulf Coast by virtue of that certain Agreement and Plan of Merger dated October 12, 2012 (the "**Merger Transaction**").

23. The consideration paid by the Debtor under the Merger Transaction totaled seventy-two million dollars ($72,000,000) (the "**Merger Consideration**").

24. The Debtor funded the Merger Consideration substantially through an equity infusion in excess of $29 million from the Debtor's shareholders and a $42 million term loan from Prospect (the "**Merger Consideration Financing**").

25. Defendant Prospect provided the Merger Consideration Financing, which was evidenced by that certain Credit Agreement dated October 12, 2012 (the "**Credit Agreement**") by and among Gulf Coast, as borrower, Prospect, as lender, and the Debtor, as guarantor.

26. The Debtor guaranteed the Merger Consideration Financing.

27. To evidence the Debtor's guaranty of the Merger Consideration Financing, the Debtor entered into that certain Guaranty and Security Agreement dated as of October 12, 2012 (the "**Guaranty Agreement**") by and among Gulf Coast, the Debtor, and Defendant. A true and correct copy of the Guaranty Agreement is attached hereto as Exhibit C.

28. At no time prior to the closing on the Merger Transaction and the Merger Consideration Financing did the Debtor know that Defendant or one of its affiliates or entities under its control desired, and had tried, to acquire Gulf Coast.

29. Prior to the closing on the Merger Transaction and the Merger Consideration Financing, Defendant concealed the material fact that Defendant or one of its affiliates or entities under its control desired, and had tried, to acquire Gulf Coast.

30. Under the terms of the Guaranty Agreement, the Debtor, among other things, pledged all of its stock in Gulf Coast (the "**Gulf Coast Stock**") to Defendant as collateral for Gulf Coast's repayment of its obligations under the Credit Agreement.

31. Under the Guaranty Agreement, the Debtor appointed Defendant as Debtor's attorney-in-fact, only during a period of default, to carry out the terms of the Guaranty, to take certain actions with respect to the Gulf Coast Stock, and to execute certain documents with respect to the Gulf Coast Stock. The Guaranty Agreement also provided a mechanism for the sale of the Gulf Coast Stock in the event of a default under the Credit Agreement and Guaranty Agreement.

32. From and after the Closing Date, the Debtor, as the sole shareholder of Gulf Coast, elected the board of directors, which, in turn, set Gulf Coast's strategic direction and oversaw Gulf Coast's officers who were responsible for the implementation of a strategy to maximize Gulf Coast's value to Debtor.

33. Soon after the Closing Date, the Debtor became aware of certain operational issues of Gulf Coast that had not been previously disclosed.

34. Specifically, within two months after the Closing Date, Gulf Coast experienced a failure its most significant equipment.

35. This equipment failure adversely affected Gulf Coast's revenue, sales, and profitability.

Case 14-50003-BLS Doc 1 Filed 01/31/14 Page 7 of 18

36. While sales appeared to increase in January 2013, Gulf Coast management later determined that those increased sales orders were "booked" at unauthorized, reduced prices, which significantly deflated revenue.

37. In February and March of 2013, the Debtor implemented significant organizational changes, including the termination of the vice president of sales, the hiring of a new chief financial officer, and the implementation of a new price quoting system.

38. Notwithstanding the Debtor's efforts, in May 2013, Gulf Coast published its financial results for the prior month, which showed an operational loss.

39. As a result, Prospect and PNC Bank, National Association ("**PNC Bank**"), Gulf Coast's lender under that certain Revolving Credit and Security Agreement dated October 12, 2012 (the "**Revolving Credit Agreement**"), issued default notices to the Debtor and Gulf Coast asserting that Gulf Coast and the Debtor violated a financial covenant under the Credit Agreement and the Revolving Credit Agreement (each a "**Default Notice**" and together the "**Default Notices**").

40. Under Defendant's Default Notice, Defendant began to unreasonably pile pressure on the Debtor financially by charging the Debtor and Gulf Coast increased interest, amounting to another $69,000 or so per month, under the Credit Agreement. PNC Bank, however, did not charge Default Interest under the Revolving Credit Agreement in its Default Notice.

41. Prior to May 2013, Gulf Coast's board of directors had been led to believe, through Gulf Coast's senior management (who were installed prior to the Merger Transaction), that the decrease in sales and revenue resulted from the political and fiscal uncertainty connected with the 2012 Presidential and Congressional elections.

42. As Gulf Coast's investigation would soon uncover, the problem ran deeper.

43. Due to Gulf Coast's unexpected and sudden deteriorated financial performance, the Debtor spent significant time and expense in May and June 2013 to determine the cause of Gulf Coast's operational losses.

44. In June 2013, the Debtor concluded its investigation and reported to Defendant that Gulf Coast's weak sales and revenue resulted from an overall market downturn in the forging industry.

45. The Debtor also concluded and reported to Prospect that the industry downturn was expected to last through 2013.

46. In addition, at all times relevant hereto, the Debtor and Gulf Coast provided detailed and confidential financial and operational data and other confidential information to Prospect on a regular and consistent basis.

47. The industry downturn ran contrary to the favorable assessments of market demand and conditions that was provided at the time that Altus submitted the winning bid at auction for the purchase of Gulf Coast in October 2012.

48. As a result of the Debtor's findings, the Debtor worked with Gulf Coast's management to implement personnel and cost reductions, align Gulf Coast's operational structure with the then-current levels of market demand, and realign Gulf Coast's management team to more effectively operate the business.

49. In June 2013, the Debtor also met in person with Defendant and by telephone with PNC Bank to review the historical performance of Gulf Coast, discuss the cause of Gulf Coast recent performance, outline all steps taken to respond to the industry downturn, re-forecast revenues for the balance of 2013, and preliminarily forecast revenues for 2014.

50. At the June 2013 meeting, the Debtor requested that Defendant and PNC Bank waive the asserted covenant default and reset the covenant levels under the Credit Agreement and the Revolving Credit Agreement based on the reduced market demand.

51. At the June 2013 meeting, Defendant — for the first time — admitted that Defendant, either through itself, through Prospect Capital Management, or through Ajax, had desired to own Gulf Coast, had participated in the auction to purchase Gulf Coast, and had attempted to purchase Gulf Coast.

52. At that same meeting, Defendant pressed the Debtor and Gulf Coast to allow an executive of Ajax — one of Gulf Coast's competitors that Prospect controlled or owned — to have access to Gulf Coast's financial data and facility. Debtor and Gulfco denied this odd request and became concerned that Prospect was detrimentally sharing Gulf Coast's confidential information with outsiders without permission.

53. At this meeting, it became evident that Defendant had no desire to work with the Debtor and Gulf Coast to resolve any issues outstanding under the Credit Agreement. To the contrary, it became evident that Defendant had a scheme to take Gulf Coast from the Debtor.

54. Specifically, in June 2013, the Debtor and Gulf Coast proposed a loan modification that, among other things, would waive any asserted financial covenant defaults and reset then-existing covenant levels.

55. In or around July 2013, PNC Bank indicated to the Debtor that it was willing to waive its asserted financial covenant default and reset the covenant levels under the Revolving Credit Agreement. Despite PNC Bank's willingness to waive the asserted financial covenant default and reset the covenant levels, however, Defendant unreasonably refused to do so under the Credit Agreement.

56. Instead, Defendant demanded that the Debtor make a $5.7 million dollar equity infusion even though Gulf Coast had not suffered from any liquidity crises from and after the Merger Transaction, had no immediate needs for such cash, and the cash infusion would not have cured the covenant default under the Credit Agreement.

57. Defendant's baseless demand for an unnecessary equity infusion and refusal to waive its asserted financial covenant default and reset the covenant levels were all part of Prospect's plan to ultimately acquire Gulf Coast.

58. Defendant rebuffed the Debtor's and Gulf Coast's attempts at further discussions, except to restate its unreasonable (and unneeded) demand for a $5.7 million equity infusion, including by, among other things, refusing to respond to written communications and telephone calls.

59. In July and August 2013, the Debtor continued making adjustments to deal with Gulf Coast's weaker than forecasted revenues, including replacing Gulf Coast's chief executive officer and having the principals of an Altus affiliate assume operational control of Gulf Coast.

60. During this time, Prospect continued in its persistent refusal to consult with the Debtor with respect to the operations of Gulf Coast's business or the covenant default asserted by Defendant under the Credit Agreement.

61. In September 2013, the Debtor met with Gulf Coast management to discuss Gulf Coast's liquidity needs to fund new capital expenditures and hiring a new vice president of sales.

62. Thereafter, the Debtor again attempted to discuss with Defendant a proposal to place Gulf Coast on a more sound financial footing.

63. While PNC Bank again expressed a willingness to agree to the Debtor's proposal <u>if</u> Prospect agreed, Defendant refused even to discuss the proposal.

64. Defendant instead demanded detailed financial information relating to Gulf Coast, which was provided promptly.

65. Prospect neither provided feedback on the information requested nor responded to the Debtor's proposal. Instead, Prospect refused even to speak with the Debtor.

66. As a result of Defendant's pattern of delay, unreasonable refusal to engage in good faith discussions, and as a result of PNC Bank's increasing concern that the funds made available to Gulf Coast under the Revolving Credit Agreement were not benefiting Gulf Coast but instead were used to pay Defendant's default rates of interest under the Credit Agreement, PNC Bank issued a notice of intent to terminate the Revolving Credit Agreement within ninety (90) days and installed a $1 million block under the Revolving Credit Agreement (the "**Line of Credit Block**").

67. The Line of Credit Block was instituted as a result of Defendant's misconduct.

68. The Line of Credit Block caused the Debtor and Gulf Coast to suffer a liquidity problem.

69. From and after the closing on the Merger Transaction and prior to PNC Bank's installation of the Line of Credit Block, neither Gulf Coast nor the Debtor experienced any liquidity issues.

70. Because the Defendant continued to refuse to engage in any discussions with the Debtor or Gulf Coast (including about the Line of Credit Block), Gulf Coast was financially constrained to not make the principal payment due to Defendant under the Credit Agreement on September 30, 2013.

71. Defendant did not issue a default notice with respect to such non-payment.

72. In October 2013, the Debtor and Gulf Coast again contacted Defendant to attempt to reach a resolution of the asserted covenant default.

73. In that discussion, the Debtor explained Gulf Coast's liquidity concerns caused by the Line of Credit Block, which had resulted from Defendant's bad faith conduct.

74. In that discussion, the Debtor and Gulf Coast stressed the need for a prompt resolution, and described Gulf Coast's liquidity needs, including the need for funds to hire a new vice president of sales.

75. In light of Gulf Coast's needs and the Debtor's desire to see Gulf Coast succeed, the Debtor proposed that Altus would loan Gulf Coast and the Debtor $1 million on favorable terms, reduce certain executive compensation, and forego certain management fees due from Gulf Coast, if Defendant agreed to *defer* – not waive – payment of five (5) principal payments.

76. Defendant, however, continued in its refusal to discuss any of these issues, at least until it received the September 30, 2013 principal payment due under the Credit Agreement. In response to Defendant's demand, Gulf Coast reluctantly made the September 30, 2013 principal payment, but only for the purpose of having a dialogue with Defendant.

77. After Defendant received Gulf Coast's September 30, 2013 principal payment, Defendant promptly rejected the Debtor's proposal and demanded, among other things, that: (1) any new arrangement require any loan from Altus to be subordinate in payment to Prospect; and (2) the Credit Agreement must be modified to provide for a new $2 million excess availability covenant.

78. During the time period that the foregoing discussions took place and during October 2013, Gulf Coast achieved record sales, which would not translate into revenue immediately.

79. As a result of Prospect's unreasonable demands and given the record levels of sales in October 2013, the Debtor began exploring alternatives, including, but not limited to, take-out financing, discounted payoffs, and balance sheet restructuring involving Defendant's conversion of some of its debt to equity.

80. In order to allow the Debtor and Gulf Coast to focus on Gulf Coast's operations, Altus and the Debtor engaged an outside advisor (the "**Advisor**") to assist in facilitating a restructuring and to lead negotiations with both Defendant and PNC Bank.

81. The Advisor informed Prospect that Gulf Coast would not make the interest only payment due on October 31, 2013, but instead would provide Defendant with a restructuring proposal, which it did on November 1, 2013.

82. True to form, Defendant did not respond or provide any feedback.

83. Neither the Debtor nor Gulf Coast made the interest only payment due to Prospect under the Credit Agreement on October 31, 2013.

84. Defendant did not issue a default notice with respect to such non-payment

85. On November 1, 2013, Altus, the Debtor, PNC Bank, and Gulf Coast met with Defendant. At the meeting, Altus and the Debtor presented Defendant with a restructuring proposal (the "**Restructuring Proposal**").

86. Defendant seemed receptive to the Restructuring Proposal, asked questions, and requested additional information.

87. Altus, the Debtor and Gulf Coast responded to all of Defendant's questions and promptly provided Defendant with all information that Defendant had requested.

88. Little did Gulf Coast and the Debtor know that at all relevant times hereto Defendant had no intention of ever engaging in good faith discussions in connection with Gulf

Coast, had no intention of ever engaging in any transaction that would provide financial relief to Debtor and Gulf Coast, and in fact, had taken steps to gain control of Debtor's most significant asset.

89. On November 8, 2013, instead of responding to the Restructuring Proposal, Defendant transferred to itself 99.9% of the Debtor's ownership interest in Gulf Coast and all of the Debtor's control over Gulf Coast (the '**Transfer**").

90. Only then did the Debtor realize that Defendant had long been using Gulf Coast's confidential information for an extended period of time to finalize and implement its scheme to, in effect, steal Gulf Coast from the Debtor.

91. Since Prospect's power play to grab Gulf Coast, and while under Prospect's control, Gulf Coast's performance and value have further deteriorated.

**<u>FIRST CLAIM FOR RELIEF</u>**
(Avoidance of Preferential Transfers Pursuant to 11 U.S.C. § 547)

92. Debtor incorporates herein by reference each and every allegation set forth above.

93. On or within ninety (90) days before the Petition Date (the "**Preference Period**"), the Defendant, by its unlawful domination and control of Gulf Coast, purported to cause, in effect, the involuntary transfer to itself of Debtor's property interest in Gulf Coast. Defendant accomplished the unlawful transfer by transferring to itself 99.9 percent of the ownership interest of Gulf Coast and 100 percent control over Gulf Coast, which was, prior to the Transfer, solely owned or controlled by the Debtor.

94. Defendant was a creditor of the Debtor at the time of the transfer within the meaning of Section 101(10)(A) of the Bankruptcy Code.

Case 13-11003-BLS Doc 1 Filed 01/31/14 Page 15 of 18

95. The Transfer was made, or caused to be made, for or on account of one or more antecedent debts owed by the Debtor to the Defendant, as evidenced by the Credit Agreement and Guaranty.

96. The Transfer was made within ninety (90) days prior to the commencement of the Debtor's bankruptcy case.

97. The Transfer was made while the Debtor was insolvent or caused the Debtor to become insolvent.

98. The Transfer allowed Defendant to receive more than it would have received had the transfer not occurred, had the Debtor filed a case under Chapter 7 of the Bankruptcy Code, and had Defendant received a distribution from a hypothetical Chapter 7 bankruptcy estate on account of its claim.

**SECOND CLAIM FOR RELIEF**
**(Avoidance of Fraudulent Transfers Pursuant to 11 U.S.C. § 548)**

99. Debtor incorporates herein by reference each and every allegation set forth above.

100. Within two (2) years prior to the Petition Date (the "**2-Year Period**"), the Defendant, by its unlawful domination and control over Gulf Coast, purported to cause, in effect, the involuntary transfer to itself of Debtor's property interest in Gulf Coast (the "**2-Year Transfer**").

101. Defendant accomplished the unlawful transfer by transferring to itself 99.9 percent of the ownership interest of Gulf Coast and 100 percent control over Gulf Coast, which was, prior to the 2-Year Transfer, solely owned or controlled by the Debtor.

102. The 2-Year Transfer was to and for the sole benefit of the Defendant.

103. The Debtor received no value whatsoever, and certainly less than reasonably equivalent value, in exchange for the 2-Year Transfer.

104. The Defendant is the initial transferee of the 2-Year Transfer and the entity for whose sole benefit the 2-Year Transfer was made.

105. The Debtor was insolvent on the date of the 2-Year Transfer or became insolvent as a result of the 2-Year Transfer having been made.

**THIRD CLAIM FOR RELIEF**
**(Liability for Recovery Under 11 U.S.C. § 550)**

106. Debtor incorporates herein by reference each and every allegation set forth above.

107. Because of the preferential and fraudulent transfer in which Defendant engaged, Debtor is entitled to recover, under 11 U.S.C. §550, for the benefit of Debtor's estate, the transferred property, namely Gulf Coast, from Defendant as the initial transferee of such transferred property.

**FOURTH CLAIM FOR RELIEF**
**(Breach of Contract and Covenant of Good Faith and Fair Dealing)**

108. Debtor incorporates herein by reference each and every allegation set forth above.

109. The Credit Agreement and the Guaranty Agreement contained implied covenants of good faith and fair dealing.

110. Said covenants obligated Defendant to act reasonably and rationally and not arbitrarily, inequitably, or in bad faith with respect to the exercise of Defendant's rights as a creditor of Debtor. The covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, even where the conduct is not expressly forbidden by any contractual provision.

111. Defendant breached its duty to Debtor of good faith and fair dealing by predatory, overreaching, and bad faith conduct in unlawfully exercising Defendant's rights in a manner exceeding what was reasonably necessary under the circumstances, thereby causing

disproportionate harm to Debtor that totally deprived Debtor of the value of the transactions with Defendant.

112. Because of Prospect’s misconduct, Prospect has destroyed Debtor’s value in the acquisition of Gulf Coast.

113. Based on Defendant’s unlawful and inequitable conduct, Debtor is entitled to equitable relief from this court voiding and setting aside the preferential, fraudulent, and inequitable transfer of Gulf Coast to Defendant and restoring Debtor as the sole shareholder in possession and control of Gulf Coast.

**WHEREFORE**, Debtor demands:

A. Judgment in Debtor’s favor and against Defendant on all claims for relief;

B. As to the First Claim for Relief, judgment in Debtor's favor and against Defendant setting aside the preferential transfer and restoring Debtor as the sole shareholder in possession and control of Gulf Coast;

C. As to the Second Claim for Relief, judgment in Debtor's favor and against Defendant setting aside the fraudulent conveyance, restoring Debtor as the sole shareholder in possession and control of Gulf Coast and awarding Debtor punitive damages and its attorneys' fees and costs;

D. As to the Third Claim for Relief, judgment in Debtor's favor and against Defendant setting aside the preferential and fraudulent transfer and restoring Debtor as the sole shareholder in possession and control of Gulf Coast;

E. As to the Fourth Claim for Relief, judgment in Debtor's favor and against Defendant setting aside the preferential, fraudulent, and inequitable transfer and restoring Debtor as the sole shareholder in possession and control of Gulf Coast;

F. Such other and further relief as this Court deems just and proper.

Dated: January 31, 2014

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP**

By: /s/ Michael J. Barrie

Michael J. Barrie (No. 4684)
Jennifer R. Hoover (No. 5111)
222 Delaware Avenue, Suite 801
Wilmington, Delaware 19801
Telephone: (302) 442-7010
Facsimile: (302) 442-7012
mbarrie@beneschlaw.com
jhoover@beneschlaw.com

- and -

David W. Mellott, Esq. (*pro hac vice*)
200 Public Square, Suite 2300
Cleveland, Ohio 44114-2378
Telephone: (216) 363-4465
Facsimile: (216) 363-4588
dmellott@beneschlaw.com

*Counsel for the Plaintiff Gulfco Holding Corp.*